# ATTACHMENT A:
## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR
## 1720 LONG PAW LANE, CHARLOTTE, NORTH CAROLINA

1. I, M. Clint Bridges, Task Force Officer (TFO), U.S. Drug Enforcement Administration (DEA), presently assigned to Charlotte, North Carolina, being duly sworn, state:

2. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 8, 18, 19, 21, 31 United States Code and other related offenses.

3. I am a Detective with Gastonia Police Department and am currently assigned as a Task Force Officer with the Drug Enforcement Administration (DEA) and have been so assigned since December 2013. I have worked as a law enforcement officer since 2002 and have been employed with the Gastonia Police Department for since 2007. During my tenure at the Gastonia Police Department, I have been assigned to the special investigations division, street crime unit, as well as the patrol division. Prior to being employed with the Gastonia Police Department, I was employed with the Shelby Police Department for over seven (7) years. During my tenure at the Shelby Police Department, I worked assignments in the narcotics/vice division, street crime unit, as well as the patrol division.

4. I attended a 500-hour basic law enforcement training program at Gaston College in 2002. I have also attended various training courses where the subject matter was the interdiction of narcotics and the detection of narcotic smuggling techniques.

5. Since December 2002, I have been involved in several investigations of individuals who derive substantial income from unlawful activities, including the importation, manufacture, cultivation, distribution, and sale of illegal controlled substances. In addition, I have experience

in the execution of search warrants and the debriefing of defendants, cooperating witnesses, informants, and other persons who have personal knowledge of the amassing, spending, converting, transporting, distributing, laundering, and concealing proceeds of unlawful activities. I am familiar with the habits and practices of persons engaged in violations of controlled substance laws, and I have more than 12 years of experience in narcotics investigations. I have actively participated in federal and state wiretap investigations, undercover drug purchases, searches and seizures, surveillances, intelligence analyses, drug reversals, conspiracy investigations, arrests, interviews and interrogations, drug interdictions, eradications, and clandestine laboratories. I have searched numerous residences and businesses for items related directly and indirectly to drug distribution. I have been tendered as an expert witness in the field of drug trafficking in federal court, in the Western District of North Carolina.

6. As a result of my personal participation in the investigation of matters referred to in this Affidavit, and based upon reports made to me by other law enforcement officials, I am familiar with the facts and circumstances of this investigation. The information contained in this Affidavit is provided for the limited purpose of establishing probable cause in support of search warrant for the above-listed real property, within the Western District of North Carolina; therefore, I have not included each and every fact known to me concerning this investigation.

7. Based on my training and experience, and participation in controlled substance investigations, and financial investigations, which result from violations of narcotics laws, I know:

   a. That large scale narcotics trafficker must maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug business.

   b. That drug traffickers very often place assets in names other than their own to avoid detection of these assets by law enforcement.

   c. That even though these assets are in other persons' names, the drug traffickers' continue to use these assets and exercise control over them.

d. That drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, ordering, sale purchase, and distribution of controlled substances.

e. That these aforementioned books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers are readily available to the drug traffickers such as in their residences, places of business, and alternate storage locations (such as mini-storage facilities).

f. That it is common for large scale drug traffickers to secrete contraband, including but not limited to packaging material and other paraphernalia, in secure locations for ready access, and to conceal them from law enforcement, including in their vehicles, so they can be easily and quickly moved.

g. That persons involved in drug trafficking conceal in secure locations, with ease of access, large amounts of currency and other proceeds of drug transactions, and financial instruments and other evidence of financial transactions relating to the obtaining, transfer, secreting, and spending of drug transaction proceeds.

h. That when drug traffickers amass large amounts of money from the trafficking in illegal drugs that they attempt to hide their illegal origin. In order to accomplish this, they utilize foreign and domestic banks, cashier's checks, money drafts, real estate, and business fronts.

i. That documents relating to such attempts to hide the illegal origin of such proceeds are kept where the traffickers have ready access to them, often in their residences, places of business, and alternative storage locations, and often in close proximity to illegal drugs.

j. That it is common for drug traffickers to travel to major distribution centers and cities such as the Charlotte, North Carolina and Atlanta, Georgia areas and surrounding areas to receive and distribute drugs. That these methods of transportation include commercial airlines, commercial vessels, private aircraft, rental automobiles, private automobiles, and other such means of transportation.

k. That it is common for the drug traffickers to keep and maintain records of their travels in locations for easy access such as their residences, places of business and mini-storage facilities.

l. That drug traffickers commonly maintain addresses or telephone numbers, in books, papers, cell phones or tablets, which reflect names, addresses, and/or telephone numbers for associations in the drug trafficking organization, and keep these records in their residences, places of business and mini-storage facilities.

m. That firearms are considered "tools of the drug trafficking trade." That is, traffickers often possess firearms to protect themselves, their drugs, and their proceeds from law enforcement, competitor drug traffickers, and would-be thieves.

n. That the drug traffickers take or cause to be taken photographs of them, their associates, their property and their drugs, and that they usually keep these photographs in their residences, places of business, and alternative storage locations with other drug-related documents.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

8. Since 2019, the DEA and HSI, in conjunction with the North Carolina State Bureau of Investigation (SBI) and various local law enforcement agencies, have targeted an extensive network of methamphetamine and heroin distributors operating in the Western District of North Carolina (WDNC) as part of Operation ICEBERG, an Organized Crime Drug Enforcement Task Force investigation. Those efforts have resulted in the federal arrest and prosecution of more than 40 methamphetamine traffickers responsible for the clandestine introduction and distribution of methamphetamine within this district, and various sources of supply identified and arrested outside this district. This collaborative effort has also resulted in the seizure of more than 20 kilograms of methamphetamine, 2.5 kilograms of heroin, 12 kilograms of cocaine, 14 kilograms of fentanyl, over $175,000 in United States currency, and more than 53 firearms.

9. On December 19, 2020, in Cramerton (Gaston County), North Carolina, a Cramerton Police Department officer observed Donovan Lee KELLY's vehicle make an abrupt left turn from the far right lane, across the center lane, and across the left hand turn lane into a parking lot, all without using a turn signal. The vehicle had multiple large cracks spanning the length of the windshield. When the officer pulled behind the Defendant's vehicle, he saw the driver (KELLY) reaching around the inside of the front and back seat of the vehicle. He also observed one passenger in the front and one in the back. When he made contact with the driver, KELLY showed the officer citations for Driving With License Revoked and No Insurance, among other things, that

KELLY said he had just received from another officer.  KELLY was very animated and agitated, speaking loudly and fast.  There were multiple indications of KELLY's nervous state.  Neither passenger had a valid driver's license.  Thus, the officer decided to have the vehicle towed.

10. The officer observed KELLY's criminal record, with prior drug charges and, in conjunction with the other circumstances, decided to deploy his K-9 narcotics detection dog.  The K-9 had been properly trained and certified.  When KELLY saw the K-9 being deployed, KELLY hung his head and slumped his shoulders.  The K-9 alerted to the presence of narcotics in the vehicle.

11. When the officer removed a box of medication from a Nike backpack, KELLY made spontaneous statements that indicated his knowledge of the contents of the backpack.  In the backpack, the officer recovered 7 grams of heroin.  Through the armrest in the back seat into the trunk, the officer located a magnetic black box and a Hi-Point .40 caliber handgun.  In the box, the officer recovered 7 grams of methamphetamine and several pills of various type.  On his person, KELLY had $153 in cash.

12. Based on my training and experience, and the facts of this case, KELLY possessed the drugs with intent to distribute and possessed the firearm – which was manufactured outside the State of North Carolina and, thus, traveled in and affected interstate commerce – in furtherance of drug trafficking.

13. KELLY has a prior conviction for felon in possession of a firearm and knew he was prohibited from possessing firearms.

14. On January 13, 2021, the investigative team debriefed with a confidential informant (CI #1) – who agreed to cooperate with the investigation, making statements against his/her own penal interest, so he is deemed credible – who described drug trafficking with Donovan KELLY

and another co-conspirator since June 2020. CI #1 explained purchasing 3 ounces (84 grams) of methamphetamine from KELLY and seeing KELLY in possession of an additional 4 ounces (112 grams).

15. The investigative team obtained information from a second confidential informant (CI #2) – who has been proven to be truthful and reliable, and whose information has been corroborated to the extent possible –- that KELLY was involved in the distribution of methamphetamine and other drugs from 1720 Long Paw Lane, Charlotte, North Carolina, which is KELLY's residence.

16. In mid-June 2021, CI #2 told the investigative team that on the prior day, she/he had observed KELLY in possession of a large amount of methamphetamine, heroin, and several firearms at his 1720 Long Paw Lane residence. KELLY also bragged to CI #2 about his involvement in large-scale poly-drug trafficking.

*The rest of this page was intentionally left blank.*

## CONCLUSION

Based upon training, experience, and the facts of this investigation, I submit that there is probable cause to believe that there is probable cause to believe that the Items to be Seized, listed in Attachment C, will be found inside of 1720 Long Paw Lane, Charlotte, North Carolina, and any outbuildings or vehicles located thereon (the "Place to be Searched"), described in Attachment B; therefore, I request that the Court issue a warrant for the same.

/s/ M. Clint Bridges                              .
OFFICER M. CLINT BRIDGES
AFFIANT, TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

*AUSA Steven R. Kaufman has reviewed this Affidavit.*

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 23rd day of June, 2021, at 1:38 pm.

Signed: June 23, 2021

David S. Cayer
United States Magistrate Judge

# ATTACHMENT B

## Places to be Searched

The Place to be Searched is 1720 Long Paw Lane, Charlotte, North Carolina, depicted in the following photograph, and any outbuildings or vehicles located thereon:



# ATTACHMENT C
## Items to be Seized

This Affidavit is made in support of this Application to seize the following items:

1. Books, papers, records, receipts, personal telephone/address directories, telephone billing records, notes, ledgers, documents, airline tickets, travel documents, and documentation of occupancy or ownership of premises.

2. Bank records, money orders, wire transfer records or receipts, financial instruments, financial transaction records, cashier's checks, traveler's checks, money drafts and related financial records, money wrappers, currency counting machines/devices.

3. United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, precious metals, any lock type box and safes as to conceal or hide from view.

4. Property deeds, vehicle registrations or titles, and/or other items evidencing the obtainment, concealment, and/or transfer or expenditure of funds or currency.

5. Cameras, photographs, videotapes or other images, in particular images of assets, controlled substances, and/or co-conspirators.

6. Identification cards.

7. Cellular telephones, tablets, computers or other electronic devices used for record keeping of drug ledgers.

8. Packaging material, scales, presses, and other drug trafficking paraphernalia.

9. Weapons, including but not limited to firearms and ammunition